Robert L. Weigel
Howard S. Hogan
Alison L. Wollin
Anne M. Coyle
GIBSON, DUNN & CRUTCHER, LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Plaintiffs Gucci America, Inc.,*
*Balenciaga S.A., Balenciaga America, Inc.,*
*Bottega Veneta S.A., Bottega Veneta Inc.,*
*Yves Saint Laurent America, Inc.,*
*Luxury Goods International (L.G.I.) S.A.,*
*and Kering S.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

GUCCI AMERICA, INC.; BALENCIAGA S.A.;
BALENCIAGA AMERICA, INC.; BOTTEGA
VENETA S.A.; BOTTEGA VENETA INC.; YVES
SAINT LAURENT AMERICA, INC.; LUXURY
GOODS INTERNATIONAL (L.G.I.) S.A.; and
KERING S.A.,

             Plaintiffs,

    -against-

ALIBABA GROUP HOLDING LTD.;
ALIBABA.COM HONG KONG LTD.;
ALIBABA.COM LTD.; ALIBABA.COM
INVESTMENT HOLDING LTD.; ALIBABA.COM
INVESTMENT LTD.; ALIBABA (CHINA)
TECHNOLOGY CO., LTD.; ALIBABA.COM, INC.;
TAOBAO HOLDING LTD.; TAOBAO CHINA
HOLDING LTD.; TAOBAO (CHINA) SOFTWARE
CO., LTD.; ALIPAY.COM CO., LTD.;
HANGZHOU YANBEI TRADING CO., LTD.;
YIWU BOTHWINER FASHION ACCESSORY
CO., LTD.; GUANGZHOU YONGXING LEATHER
GOODS MFG.; DONGGUAN HUAWANG
LEATHER CO., LTD.; SHEN ZHEN AIERS
WATCH CO., LTD.; SHENZHEN MEIGEER
WATCH CO., LTD.; SHENZHEN BABYLON

2014 Civ. 5119 (CASTEL)

**DECLARATION OF**
**LAURENT CLAQUIN**

WATCH CO., LTD.; VANCS WHERE BOUTIQUE; :
SPRING RAIN LEATHER GOODS; CELEBRITY :
SHOE; JINLONG LUXURY CITY; GUCCI :
FASHION SHOP; LADYLIDY SHOP; COCO :
FASHION STYLE; HUIMING LEATHER MALL; :
HONG KONG LONGITUDE AND LATITUDE :
INTERNATIONAL TRADING; FASHION ZONE :
LTD.; STAR FACTORY; XIAOHUI JIN'S STORE; :
and JOHN DOES, :
                                          :
                Defendants.               :
                                          :
                                          :
                                          :
-----------------------------------------------------------X

I, Laurent Claquin, declare as follows:

1.      I am the President of Kering Americas, an affiliate of Kering S.A. ("Kering").

Kering is a multinational company with a premier portfolio of globally recognized brands.

Kering is a world leader in apparel and accessories—designing, manufacturing, and marketing

both luxury and sport and lifestyle products for consumers across the world.  Kering brands

include the following Plaintiffs in this action:  Gucci America, Inc. ("Gucci"), Balenciaga

America, Inc. and Balenciaga S.A. ("Balenciaga"), Bottega Veneta, Inc. and Bottega Veneta

S.A. ("Bottega Veneta"), and Yves Saint Laurent America, Inc. and Luxury Goods International

(L.G.I.) S.A. ("YSL").

2.      I have been employed by Kering since 2004.  As President of Kering, my

responsibilities include certain intellectual property protection for Gucci, Balenciaga, Bottega

Veneta, and YSL.

3.      I submit this declaration in support of the application of Plaintiffs for a temporary

restraining order and preliminary injunction.  The facts set forth below are based on my personal

knowledge, my review of records pertaining to this matter, and additional facts communicated to

me by those working at my direction.  If required to do so, I could and would testify as follows:

4.     The trademark registrations attached to the Complaint filed by Plaintiffs in this action are true and correct copies of the PTO certificates.

**GUCCI**

5.     Gucci is organized and exists under the laws of New York, with its principal place of business located at 685 Fifth Avenue, New York, New York 10022.  Gucci is a corporate affiliate of Kering, which is organized and exists under the laws of France, with its principal place of business located at 10 Avenue Hoche, Cedex 08, Paris, France 75381.

6.     Gucci, through its affiliated companies, is a leader in the design, marketing, and distribution of premium, high-quality consumer products in leather goods, clothing, jewelry, accessories, suits, home products, and related items (collectively, the "Gucci Products").  For more than eighty-five years, Gucci and its affiliates have developed a reputation for excellence among all products sold in connection with the Gucci name, within the United States and internationally.

7.     Consumers identify Gucci Products through the trademark GUCCI name, as well as through the product designs, logos, and other source identifying indicia selected and promoted by Gucci (collectively, the "Gucci Marks").

8.     Over the decades, literally hundreds of millions of consumers have been exposed to the Gucci Marks not only in advertisements, but in fashion magazines, television programs, motion pictures, and virtually all instrumentalities of popular culture.  For example, recent press reports recount that Jacqueline Kennedy, Audrey Hepburn, and young Princess Caroline of Monaco "were fans of the label" and that Gucci's archives of famous photo shoots include "Princess Di as a child bride and sassy young woman, Britt Ekland trading double G logos with Peter Sellers, and Madonna in various hug-me-tight leather jackets."  *See, e.g.,* Ex. 1 (press

reports describing Gucci as a "jet set brand"; "strong brand"; and "star brand and a money tree"). Gucci spends millions per year in the United States to advertise its brand, with an advertising campaign that includes frequent full-page advertisements in the <u>New York Times</u>, <u>Los Angeles Times</u>, <u>Harper's Bazaar</u>, <u>Vogue</u>, and numerous other widely-distributed fashion and news publications.

9.     As a result, the Gucci Marks are among the most widely-recognized trademarks in the United States and have become famous and highly valuable marks, possessing strong secondary meaning among consumers. The Gucci Marks are uniquely valuable among consumer trademarks because they receive a consistent level of exposure to consumers, far beyond what most apparel manufacturers or licensors can achieve to promote their products. Indeed, in 2013, Forbes deemed Gucci one of the world's ten most valued luxury brands, *see* Ex. 2 ("The World's Most Valued Luxury Brands," <u>Forbes</u>, June 7, 2013), and in 2011, Business Insider ranked Gucci as the third most valuable luxury brand in the world, *see* Ex. 3 ("The World's 10 Most Valuable Luxury Brands," <u>Business Insider</u>, May 17, 2011).

10.     Gucci manufactures, licenses, and markets a broad range of products that utilize the Gucci Marks. In addition, Gucci owns approximately fifty stores throughout North America that sell exclusively Gucci branded products, as well as over two hundred additional boutiques around the world.

11.     In order to protect the value of the Gucci Marks and official goods bearing the Gucci Marks, Gucci produces all of its leather goods and shoes in Italy and carefully selects the fine leathers and materials that are utilized in these products from a close network of artisans, craftsmen, and purveyors of specialty leathers. This process assures adherence to the highest quality standards for the manufacture and dissemination of the Gucci Products.

12.     All authorized Gucci Products bear the Gucci Marks, either on their labels, hang tags, and/or on the products themselves.

**BALENCIAGA**

13.     Balenciaga S.A. is organized and exists under the laws of France, with its principal place of business located at 15 Rue Cassette, Paris, France 75006.  Balenciaga America, Inc. is organized and exists under the laws of Delaware with its principal place of business located at 50 Hartz Way, Secaucus, New Jersey 07094, and a New York office located at 542 West 22nd Street, New York, New York 10011.  I refer to Balenciaga S.A. and Balenciaga America, Inc. collectively as "Balenciaga."

14.     Balenciaga and its licensees and affiliates are the sole and exclusive distributors in the United States of items bearing the Balenciaga trademarks on apparel, handbags, small leather goods, jewelry, and other accessories (collectively, the "Balenciaga Products").  Consumers identify Balenciaga Products through the trademark BALENCIAGA name, as well as through the product designs, logos, and other source identifying indicia selected and promoted by Balenciaga (collectively, the "Balenciaga Marks").

15.     Founded in 1919 by Cristóbal Balenciaga, Balenciaga has long been a leader in the design, marketing, and distribution of premium, high-quality products, including apparel, handbags, jewelry, and other accessories.  Balenciaga is one of France's most prestigious haute couture fashion houses and is world-renowned for its innovative, trend-setting couture clothing and fashion accessories.  Balenciaga designs are among the most exclusive and sought-after fashions in the industry.  The keys to Balenciaga's success include the provocation of its design and vision, the mastery of techniques and cut, and its constant innovation in fabrics.

16.     The Balenciaga Marks comprise a famous and well-recognized brand. Its creative director, Alexander Wang, has been described as "one of fashion's greatest sensations so far this Century." *See* Ex. 4 (BusinessofFashion.com). For over ninety years, hundreds of millions of consumers have been exposed to the Balenciaga Marks not only in advertisements, but in fashion magazines, television programs, motion pictures, and virtually all instrumentalities of popular culture. For nearly a century, Balenciaga has pioneered fashion with innovative designs that are routinely showcased by top celebrities and style icons. The tradition continues into the present day through Balenciaga's association with celebrities such as Jennifer Connelly, Nicole Kidman, Kylie Minogue, Cameron Diaz, Sarah Jessica Parker, and Vogue editor-in-chief Anna Wintour. Balenciaga has carefully built its reputation by, among other things, devoting considerable resources toward the design, development, promotion, and manufacture of all genuine Balenciaga Products; adhering to quality control standards; and committing to customer service. As such, all Balenciaga Products are manufactured pursuant to specific guidelines.

17.     As a result of Balenciaga's extensive marketing and promotional efforts, as well as the high quality of the Balenciaga Products, the brand and its products have achieved an outstanding reputation among consumers. The Balenciaga Marks have become well and favorably known in the industry and to the public as the exclusive source of Balenciaga Products, and have come to symbolize the goodwill of Balenciaga Products. Balenciaga's marketing efforts, combined with its attention to quality and construction, have resulted in millions of dollars in sales of Balenciaga Products.

18.     All authorized Balenciaga Products bear the Balenciaga Marks, either on their labels, hang tags, and/or on the products themselves.

**BOTTEGA VENETA**

19.     Bottega Veneta S.A. is organized and exists under the laws of Switzerland with its principal place of business located at Via Industria 19, 6814 Cadempino, Switzerland. Bottega Veneta Inc. is organized and exists under the laws of New York, with its principal place of business located at 50 Hartz Way, Secaucus, New Jersey 07094 and a New York office located at 699 Fifth Avenue, New York, New York 10022. I refer to Bottega Veneta International S.A. and Bottega Veneta Inc. collectively as "Bottega Veneta."

20.     Bottega Veneta creates luxury goods based on its core values of quality, craftsmanship, exclusivity, and discreet luxury. The brand achieved international renown for its unique leather weaving technique, the "intrecciato" technique, which is now synonymous with the Bottega Veneta brand. *See* Ex. 5 ("Less Is Maier," <u>Vanity Fair</u>, September 2008) (referring to the intrecciato pattern as "an international status symbol... [and] the leitmotif of the whole house"). Bottega Veneta's range of products includes:  leather goods, such as handbags, luggage and other small leather goods; women's and men's ready-to-wear clothing; shoes; jewelry; furniture; and home decorations (collectively, the "Bottega Veneta Products").

21.     The Bottega Veneta brand is synonymous with the highest craftsmanship and innovative design. The Bottega Veneta brand owes its exceptional product quality to the work of the meticulous craftsmen based in its workshop in the Veneto region of Italy.

22.     Bottega Veneta Products are sold exclusively through a tightly controlled distribution network of directly-operated stores, exclusive franchise stores, and rigorously selected department and specialty stores throughout the world. Production of Bottega Veneta Products is similarly closely monitored in order to protect the value of the Bottega Veneta Marks (as defined herein) and authentic goods bearing those marks. Bottega Veneta produces all of its

leather goods and shoes in Italy and carefully selects the fine leather and materials that are utilized in creating these products from a close network of artisans, craftsmen, and purveyors of specialty leathers. This process assures adherence to the highest quality standards for the manufacturing and dissemination of Bottega Veneta Products.

23.     Consumers identify Bottega Veneta Products through the trademark BOTTEGA VENETA name, as well as through the product designs, logos, and other source identifying indicia selected and promoted by Bottega Veneta (collectively, the "Bottega Veneta Marks"). Bottega Veneta manufactures, licenses, and markets a broad range of products that utilize the Bottega Veneta Marks. All authorized Bottega Veneta Products bear the Bottega Veneta Marks, either on their labels, hang tags, or on the products themselves (the "intrecciato" design is a registered design mark).

24.     The Bottega Veneta Marks have become famous and highly valuable marks, possessing strong secondary meaning among consumers. The Bottega Veneta Marks are uniquely valuable among consumer trademarks because they receive a consistent level of exposure to consumers, far beyond what most apparel manufacturers or licensors can achieve to promote their products. Indeed, a 2007 survey conducted by the Luxury Institute placed Bottega Veneta in the "first tier of luxury brands" and "among the top three in consumer recognition and approval." *See* Ex. 6 ("You'll Know How Much You Spent," The New York Times, March 27, 2008).

25.     Further, numerous celebrities favor the refined elegance exemplified by Bottega Veneta Products. Among the international stars who have appeared at events wearing designs created by Bottega Veneta are: Jennifer Aniston, Penélope Cruz, Maggie Gyllenhaal, Julianne Moore, and Reese Witherspoon.

**YSL**

26.     Luxury Goods International (L.G.I.) S.A. is organized and existing under the laws of Switzerland, with its principal place of business at Via Industria 19, 6814 Cadempino, Switzerland. Luxury Goods International (L.G.I.) S.A. is the registered owner of the Yves Saint Laurent Marks (as defined herein). Yves Saint Laurent America, Inc. ("YSL") is organized and exists under the laws of New York, with its principal place of business located at 3 East 57th Street, New York, New York 10022.

27.     YSL and its licensees and affiliates are the sole and exclusive distributors in the United States of items bearing the YSL Marks (as defined herein). YSL Products are sold exclusively through a tightly controlled distribution network of directly-operated stores, exclusive franchise stores, and rigorously selected department and specialty stores throughout the world. At present, YSL designs and markets a broad range of products, including handbags and other leather goods, shoes, apparel, and jewelry, as well as fragrances and cosmetics through a license agreement with L'Oréal (collectively, the "YSL Products").

28.     Founded by couturier Yves Saint Laurent in 1961, the YSL brand is one of the most prestigious luxury houses in the industry. Over the years, YSL became known throughout the fashion industry for groundbreaking designs, and its founder has been lauded as a fashion "genius" who "spent much of his career on the cutting edge." *See* Ex. 7 ("All About Yves," Time Magazine, August 3, 1998).

29.     Consumers identify YSL Products through the trademark YSL name, as well as through the product designs, logos, and other source identifying indicia selected and promoted by YSL (collectively, the "YSL Marks"). All authorized YSL Products bear the YSL Marks, either on their labels, hang tags, or on the products themselves.

30. The YSL Marks have become famous and highly valuable marks, possessing strong secondary meaning among consumers. The YSL Marks are uniquely valuable among consumer trademarks because they receive a consistent level of exposure to consumers, far beyond what most apparel manufacturers or licensors can achieve to promote their products. For over fifty years, hundreds of millions of consumers have been exposed to the YSL Marks in advertisements, fashion magazines, television programs, motion pictures, and virtually all instrumentalities of popular culture.

31. Among the fashion-forward celebrities who have appeared at events wearing YSL designs are Chloë Sevigny, Victoria Beckham, Heidi Klum, and Rihanna.

## THE COUNTERFEIT PRODUCTS

32. Gucci, Balenciaga, Bottega Veneta, and YSL (collectively, the "Plaintiffs") learned that the Merchant Defendants, through the websites Alibaba.com, Aliexpress.com, and Taobao.com, were offering counterfeit versions of their products to the general public, often by making use of the trademarked GUCCI, BALENCIAGA, BOTTEGA VENETA, and YSL names throughout the New York metropolitan area and elsewhere in the United States (the "Counterfeit Products"). Plaintiffs commenced an investigation into the Merchant Defendants' activities.

33. In particular, Plaintiffs learned that the Merchant Defendants were marketing unauthorized reproductions of official Gucci, Balenciaga, Bottega Veneta, and YSL products ("Plaintiffs' Products"). Plaintiffs learned that a good number of the Merchant Defendants maintained that they sold authentic versions of Plaintiffs' Products through the websites www.alibaba.com, aliexpress.com, and www.taobao.com. However, Plaintiffs learned that the Merchant Defendants' purported authentic designer products were unauthorized copies of

Plaintiffs' Products, including but not limited to apparel, various types of handbags, shoes, watches, and other items.

## *Merchant Defendants Selling Counterfeit Products Through Alibaba.com*

34. A number of Merchant Defendants on Alibaba.com are offering Counterfeit Products bearing the Gucci Marks without authorization. For example, shown below is an image of an authentic Gucci "Original GG Canvas Diaper Bag Tote," which retails for $795. The product displayed below bears Gucci's federally registered trademark GUCCI name, repeating "GG" design, and green-red-green stripe (U.S. Reg. Nos. 878,292; 4,229,081; 1,122,780).



35. In comparison, set forth below is an image of a Counterfeit Product offered for sale to the public through Alibaba.com by Defendant Hangzhou Yanbei Trading Co., Ltd. ("Hangzhou Yanbei"), a merchant listed on Alibaba.com as both a "Gold Supplier" (the label given to merchants that pass the Alibaba Defendants' onsite check to ensure that goods supplied by those merchants are authentic and lawful, and pay a membership fee) and an "Assessed Supplier" (Gold Suppliers that have been additionally inspected onsite by a third-party inspection company to confirm that the goods sold by those merchants are authentic and lawful), and who lists North America as one of the main markets in which it sells its goods. The price of the bag is $2–$5 per unit, and the seller is offering a minimum of 2,000 units and up to 50,000 units. The

merchant notes that the bag is "High Quality Leather, PU, cloth etc." and "other materials per client's request" and that "Buyer's logos/size/color are accepted, buyer's design is welcome." Although it is obvious that Hangzhou Yanbei is selling wholesale quantities of Counterfeit Products from its electronic store, the Counterfeit Product mimics the design of the handles and ornamentation on the authentic Gucci handbag shown above and bears an exact copy of Gucci's federally registered trademark name, repeating "GG" design, and green-red-green stripe. The Counterfeit Product is intended to confuse both the ultimate retail consumer and persons observing the ultimate consumer into believing that it is a genuine Gucci product.



36.    As a result of having inspected Hangzhou Yanbei's electronic storefront, the image of its "Gucci" tote bag, and the fact that the merchant sells mass quantities of "Gucci" bags using "materials as per client's request" for which "buyer's design is welcome" for $2–$5 per unit with a 2,000 unit minimum, Plaintiffs' representatives verified that this merchant is selling Counterfeit Products on Alibaba.com.

37.    Set forth below is an image of an authentic Gucci "soho large red leather cosmetic bag," which retails for $380.  The product displayed below bears Gucci's federally registered trademark interlocking non-facing "GG" design (U.S. Reg. No.  3,039,630).



38.    In comparison, set forth below is an image of a Counterfeit Product offered for sale to the public through Alibaba.com by Defendant Yiwu Bothwiner Fashion Accessory Co., Ltd. ("Yiwu Bothwiner"), a merchant listed on Alibaba.com as both a "Gold Supplier" and an "Assessed Supplier," and who lists North America as one of the main markets in which it sells its goods.  The price of the cosmetic bag is $3.50–$11.00 per unit, and the seller is offering a minimum of 500 units and up to 10,000 units per month.  The cosmetic bag is made of "PU," or synthetic leather.  The merchant notes that the brand name is "[c]ustomized."  Although it is obvious that Yiwu Bothwiner is selling wholesale quantities of Counterfeit Products from its electronic store, the Counterfeit Product mimics the design of the zipper and the ornamentation on the authentic Gucci cosmetic bag shown above and bears an exact copy of Gucci's federally registered trademark interlocking non-facing "GG" design.  The Counterfeit Product is intended to confuse both the ultimate retail consumer and persons observing the ultimate consumer into believing that it is a genuine Gucci product.



39.     Upon inspecting Yiwu Bothwiner's electronic storefront, the merchant's image of its "Gucci" cosmetic bag, and the fact that the merchant sells mass quantities of synthetic leather "Gucci" (or "customized" brand) cosmetic bags for $3.50–$11.00 per piece with a capacity of 10,000 pieces per month, Plaintiffs' representatives verified that this merchant is selling Counterfeit Products on Alibaba.com. In addition, the stitching, logo, and tassel on Yiwu Bothwiner's product are not in accordance with Gucci's quality control standards.

40.     Set forth below is an authentic Gucci "Leather Zip Around Wallet," which retails for $495. The product displayed below bears Gucci's federally registered trademark repeating "GG" design (U.S. Reg. No. 4,229,081).



41.     In comparison, set forth below is an image of a Counterfeit Product offered for sale to the public through Alibaba.com by Defendant Guangzhou Yongxing Leather Goods Mfg. ("Guangzhou Yongxing"), a merchant listed on Alibaba.com as both a "Gold Supplier" and an

"Assessed Supplier." Guangzhou Yongxing is offering a minimum of 300 units and up to 50,000 units per month. In addition, the merchant notes that its main market is North America. Although it is obvious that Guangzhou Yongxing is selling wholesale quantities of Counterfeit Products from its electronic store, the Counterfeit Product mimics the design of the zipper and the ornamentation on the authentic Gucci wallet shown above and bears an exact copy of Gucci's federally registered trademark repeating "GG" design. The Counterfeit Product is intended to confuse both the ultimate retail consumer and persons observing the ultimate consumer into believing that it is a genuine Gucci product.



42.     Upon inspecting Guangzhou Yongxing Leather Goods' electronic storefront, the color, material, and zipper of this wallet, and the fact that the merchant is selling up to 50,000 units of "Gucci" wallets per month sourced by "Direct Chinese factory," Plaintiffs' representatives verified that this merchant is selling Counterfeit Products on Alibaba.com.

43.     In addition to "Gucci" bags and wallets, certain Merchant Defendants are selling blatantly counterfeit "Gucci" wristwatches on Alibaba.com. Set forth below is an authentic Gucci watch, which retails for $990. The product displayed below bears Gucci's federally

15

registered trademark GUCCI name and interlocking non-facing "GG" design (U.S. Reg. Nos. 959,338; 3,470,140).



44.     In comparison, set forth below is an image of a Counterfeit Product offered for sale to the public through Alibaba.com by Defendant Shen Zhen Aiers Watch Co., Ltd ("Shen Zhen Aiers"). Shen Zhen Aiers offers these counterfeit watches at $0-$100 per piece for a minimum of 500 pieces, with a maximum available 30,000 pieces per month.   Although it is obvious that Shen Zhen Aiers is selling wholesale quantities of Counterfeit Products from its electronic store, the Counterfeit Product mimics the design of the authentic Gucci wristwatch shown above and bears an exact copy of Gucci's federally registered trademark interlocking non-facing "GG" design. The Counterfeit Product is intended to confuse both the ultimate retail consumer and persons observing the ultimate consumer into believing that it is a genuine Gucci product.



45.     Upon inspecting Shen Zhen Aiers's business, and the fact that Shen Zhen Aiers uses the term "replica" to advertise its wristwatches and is offering mass quantities of "Gucci" watches for less than $100 per piece, Plaintiffs' representatives verified that this merchant is selling counterfeit wristwatches using the Gucci Marks.

46.     Set forth below is another authentic Gucci watch, the "u-play collection" watch, which retails for $960. The product displayed below bears Gucci's federally registered trademark GUCCI name, interlocking non-facing "GG" design, and green-red-green stripe (U.S. Reg. Nos. 959,338; 3,470,140; 1,123,224).



47.     In comparison, set forth below is an image of a Counterfeit Product offered for sale to the public through Alibaba.com by Defendant Shenzhen Meigeer Watch Co., Ltd.

("Shenzhen Meigeer"), a Gold Supplier and Assessed Supplier. Shenzhen Meigeer offers these counterfeit watches at $10-$80 per piece with a minimum of 300 pieces per order and up to 200,000 pieces per month. Although it is obvious that Shenzhen Meigeer is selling wholesale quantities of Counterfeit Products from its electronic store, the Counterfeit Product mimics the design of the authentic Gucci wristwatch shown above and bears an exact copy of Gucci's federally registered interlocking trademark non-facing "GG" design and green-red-green stripe. The Counterfeit Product is intended to confuse both the ultimate retail consumer and persons observing the ultimate consumer into believing that it is a genuine Gucci product.



48.     Upon inspecting Shenzhen Meigeer's electronic storefront, and the fact that Shenzhen Meigeer uses the term "replica" to advertise its wristwatches and is offering mass quantities of "Gucci" watches for less than $100 per piece, Plaintiffs' representatives verified that this merchant is selling counterfeit wristwatches using the Gucci Marks.

49.     Moreover, in response to a query from Plaintiffs' investigator asking about a "replica Gucci watch" Shenzhen Meigeer responded: "Are you looking for the Gucci replica watch, right. It happen that our factory have such models as attached picture. Please check that

if you like them or not." The seller attached images of digital watches bearing Gucci Marks, including the picture below.



50.     The authentic "I-gucci collection watch," depicted below, which bears Gucci's federally registered trademark GUCCI name (U.S. Reg. No. 959,338), retails for $1,495. The Counterfeit Product above was purchased from Defendant Shenzhen Meigeer by Robert Holmes on June 26, 2014, for shipment to New York. *See* Declaration of Robert Holmes ("Holmes Decl.") ¶¶ 22-24; *id.*, Ex. 7.



51.     Set forth below is an authentic Gucci watch, which retails for $895. The product displayed below bears Gucci's federally registered trademark GUCCI name and repeating "GG" design (U.S. Reg. Nos. 959,338; 4,229,081).



52.     In comparison, set forth below is an image of a Counterfeit Product offered for sale to the public through Alibaba.com by Defendant Shenzhen Babylon Watch Co., Ltd. ("Shenzhen Babylon"), a Gold Supplier. Shenzhen Babylon offers these counterfeit watches at $15-$28 per piece with a minimum of 500 pieces per order and up to 20,000 pieces per month. Although it is obvious that Shenzhen Babylon is selling wholesale quantities of Counterfeit Products from its electronic store, the Counterfeit Product mimics the design of the authentic Gucci wristwatch shown above and bears an exact copy of Gucci's federally registered trademark name and repeating "GG" design. The Counterfeit Product is intended to confuse both the ultimate retail consumer and persons observing the ultimate consumer into believing that it is a genuine Gucci product.



53.     Upon inspecting Shenzhen Babylon's business and the fact that Shenzhen Babylon uses the term "replica" to advertise its wristwatches (it advertises itself as offering "Luxury waterproof high quality replica watches") and is offering mass quantities of "Gucci" watches for less than $100 per piece, Plaintiffs' representatives verified that Shenzhen Babylon Watch is selling counterfeit wristwatches bearing the Gucci Marks.

54.     Finally, certain verified Merchant Defendants on Alibaba.com are offering for sale materials advertised for use in making Counterfeit Products.  For example, Defendant Dongguan Huawang Leather Co., Ltd. ("Dongguan Huawang")—a merchant recognized as both a Gold and Assessed Supplier on Alibaba.com, and who lists North America as one of the main markets in which it sells its goods—listed 46 items advertised as "leather for Gucci bags, belts and shoes" on or about June 1, 2014.  Set forth below are images of Dongguan Huawang's listing on Alibaba.com on or about June 1, 2014, advertised as "top quality beautiful ostrich pu leather for gucci bags," "high quality & fashion pu leather for gucci bags," and "fashion pu shoe lining material for gucci."



**2014 top quality beatiful ostrich pu leather for gucci bags**

| | |
|---|---|
| FOB Price: | US $2 - 5 / Yard   **Get Latest Price** |
| Min.Order Quantity: | 500 Yard/Yards |
| Supply Ability: | 30000 Yard/Yards per Day |
| Port: | Shenzhen |
| Payment Terms: | L/C,D/A,D/P,T/T,Western Union,MoneyGram |

**Contact Supplier**

**Loading...**

See larger image

**high quantity & fashion pu leather for gucci bags**

| | |
|---|---|
| FOB Price: | US $2 - 5 / Yard   **Get Latest Price** |
| Min.Order Quantity: | 500 Yard/Yards |
| Supply Ability: | 30000 Yard/Yards per Day |
| Port: | Shenzhen |
| Payment Terms: | T/T,Western Union |

**Contact Supplier**

**Leave Messages**

Start Order    Add to Inquiry Cart

Add to MyFavorites

See larger image

**0.6mm fashion pu shoe lining material for gucci**

| | |
|---|---|
| FOB Price: | US $2 - 5 / Meter   **Get Latest Price** |
| Min.Order Quantity: | 500 Meter/Meters |
| Supply Ability: | 30000 Meter/Meters per Day |
| Port: | SHENZHEN |
| Payment Terms: | L/C,T/T,Western Union |

**Contact Supplier**

**Leave Messages**

Start Order    Add to Inquiry Cart

Add to MyFavorites

See larger image

55.     Upon inspecting Dongguan Huawang's electronic storefront, the images of the materials being offered for sale by the merchant, and the fact that Dongguan Huawang is offering 46 different types of "artificial leather" or other fabric "for gucci bags," Plaintiffs'

representatives verified that this merchant is offering materials used to make Counterfeit Products.

56.     Plaintiffs did not authorize the Merchant Defendants to manufacture, import, export, distribute, advertise, sell, or offer to sell Plaintiffs' Products and did not have the opportunity to control their quality and nature.  Plaintiffs did not approve the Counterfeit Products for sale and/or distribution.  Plaintiffs did not authorize the Merchant Defendants to make the Counterfeit Products or to offer them for sale to any customers.

***Merchant Defendants Selling Counterfeit Products Through Taobao.com***

57.     There are a number of Merchant Defendants that continue to offer for sale Counterfeit Products on Taobao.com, even though Plaintiffs' representatives explicitly complained to the Taobao Marketplace about the fact that those Merchant Defendants were selling Counterfeit Products on Taobao.com and the Merchant Defendants were allegedly disciplined.  For example, Defendant VANCS Where Boutique was offering for sale Counterfeit Products, namely footwear, bearing the Gucci Marks.  On May 21, 2014, Plaintiffs' representatives—after inspecting VANCS Where Boutique's products and verifying that the merchant was selling Counterfeit Products—notified the Taobao Marketplace that VANCS Where Boutique was offering Counterfeit Products for sale through Taobao.com.  Nonetheless, VANCS Where Boutique continued to market its Counterfeit Products through Taobao.com.  On June 2, 2014, Plaintiffs' investigator purchased counterfeit shoes from VANCS Where Boutique through Taobao.com for shipment to New York.  The counterfeit shoes, depicted below, bear Gucci's federally registered trademark repeating "GG" design (U.S. Reg. No. 4,229,081), and are offered for sale by VANCS Where Boutique for 268 RMB, which is approximately $43 per pair.  In addition, on or about June 18, 2014, Plaintiffs' representatives inspected products

received from VANCS Where Boutique and verified that the merchant is selling counterfeit shoes bearing the Gucci Marks.



58. Further, Defendant Spring Rain Leather Goods was selling Counterfeit Products to Internet users through Taobao.com. On April 18, 2014, Plaintiffs' representatives—after inspecting Spring Rain Leather Goods' products and verifying that the merchant was selling Counterfeit Products—notified the Taobao Marketplace that Spring Rain Leather Goods was offering Counterfeit Products for sale through Taobao.com. Nonetheless, Spring Rain Leather Goods continued to market Counterfeit Products through Taobao.com. On June 2, 2014, approximately one month after Plaintiffs' representatives notified Taobao Marketplace that Spring Rain Leather Goods' online storefront was offering Counterfeit Products, Spring Rain Leather Goods sold a counterfeit bag to Plaintiffs' investigator through Taobao.com for shipment to New York. The bag, depicted below, bears Gucci's federally registered trademark repeating "GG" design (U.S. Reg. No. 4,229,081), and is offered for sale by Spring Rain Leather Goods for 130 RMB, which is approximately $21. In addition, on or about June 19, 2014, Plaintiffs' representatives inspected products received from Spring Rain Leather Goods and verified that the merchant is selling counterfeit bags bearing the Gucci Marks.



59.    Further, Defendant Celebrity Shoe was selling Counterfeit Products to Internet users through Taobao.com, and on April 25, 2014, Plaintiffs' representatives—after inspecting Celebrity Shoe's products and verifying that the merchant was selling Counterfeit Products— notified the Taobao Marketplace of that fact.  Nonetheless, Celebrity Shoe continued to market Counterfeit Products through Taobao.com.  On June 2, 2014, approximately one month after Plaintiffs' representatives notified Taobao Marketplace that Celebrity Shoe's online storefront was offering Counterfeit Products, Celebrity Shoe sold counterfeit shoes to Plaintiffs' investigator through Taobao.com for shipment to New York.  The shoes, depicted below, bear Gucci's federally registered trademark green-red-green stripe and repeating "GG" design (U.S. Reg. Nos. 1,483,526; 4,229,081), and are offered for sale by Celebrity Shoe for 300 RMB, which is approximately $48 per pair.  In addition, on or about June 17, 2014, Plaintiffs' representatives inspected products received from Celebrity Shoe and verified that the merchant is selling counterfeit shoes bearing the Gucci Marks.



2014款筱马鞋 尼奇休闲鞋 **Gucci**经典潮靴
卜低 **G**家马鞋 **204282b**

**¥300.00**

10.39  P.低比A  回收

( 长 汇 时 息迷: ¥13.00  T他: ¥30.33

出售快o 3.  低了家代 25

| 38 | 39 | 40 | 41 | 42 | 43 | 44 |

件(运卡另件)  —  1  +

60.   Further, Defendant Jinlong Luxury City was selling Counterfeit Products to Internet users through Taobao.com, and on May 21, 2014, Plaintiffs' representatives—after inspecting Jinlong Luxury City's products and verifying that the merchant was selling Counterfeit Products—notified the Taobao Marketplace of that fact. Nonetheless, Jinlong Luxury City continued to market Counterfeit Products on Taobao.com. On June 2, 2014, Jinlong Luxury City sold counterfeit shoes to Plaintiffs' investigator through Taobao.com for shipment to New York. The shoes, depicted below, bear Gucci's federally registered trademark green-red-green stripe and repeating "GG" design (U.S. Reg. Nos. 1,483,526; 4,229,081), and are offered for sale by Jinlong Luxury City for 350 RMB, which is approximately $56, per pair. On or about June 17, 2014, Plaintiffs' representatives inspected products received from Jinlong Luxury City and verified that the merchant is selling counterfeit shoes bearing the Gucci Marks.



正家 男式休闲靴 **cucci**新款黑奇 木谷男靴
自务真皮潮流靴 子

¥~~1388.00~~

限时促销  **¥350.00**

( 长 汇 乎 户国 = 问也: 免定寄

出售快o 0  觉了来现 4

| 38 | 39 | 40 | 41 | 42 | 43 | 44 |

以上所有码都是靴一样

—  1  +  件(您看另件)

61.     Further, Defendant Gucci Fashion Shop was selling Counterfeit Products to Internet users through Taobao.com, and on May 7, 2014, Plaintiffs' representatives—after inspecting Gucci Fashion Shop's products and verifying that the merchant was selling Counterfeit Products—notified the Taobao Marketplace of that fact. Nonetheless, Gucci Fashion Shop continued to market Counterfeit Products on Taobao.com. On June 2, 2014, approximately one month after Plaintiffs' representatives notified Taobao Marketplace that Gucci Fashion Shop's online storefront was offering Counterfeit Products, the Gucci Fashion Shop sold a pair of counterfeit shoes to Plaintiffs' investigator through Taobao.com for shipment to New York. The shoes, depicted below, bear Gucci's federally registered trademark green-red-green stripe and repeating "GG" design (U.S. Reg. Nos. 1,483,526; 4,229,081), and are offered for sale by Gucci Fashion Shop for 328 RMB, which is approximately $53, per pair. On or about June 18, 2014, Plaintiffs' representatives inspected products received from Gucci Fashion Shop and verified that the merchant is selling counterfeit shoes bearing the Gucci Marks.



62.     Further, Defendant Huiming Leather Mall was selling Counterfeit Products to Internet users through Taobao.com, and on April 16, 2014, Plaintiffs' representatives—after inspecting Huiming Leather Mall's products and verifying that the merchant was selling Counterfeit Products—notified the Taobao Marketplace of that fact. Nonetheless, Huiming

Leather Mall continued to market Counterfeit Products on Taobao.com. On June 19, 2014, less than two months after Plaintiffs' representatives notified Taobao Marketplace that Huiming Leather Mall's online storefront was offering Counterfeit Products, Huiming Leather Mall sold a counterfeit "Gucci" bag to Plaintiffs' investigator through Taobao.com for shipment to New York, which was received on or about June 27, 2014. The bag, depicted below, bears Gucci's federally registered trademark interlocking non-facing "GG" design (U.S. Reg. No. 3,039,630), and is offered for sale by Huiming Leather Mall for 1300 RMB, which is approximately $209. Plaintiffs' representatives inspected the below item sold by Huiming Leather Mall and have determined that the bag is counterfeit.



63. Further, Defendant Hong Kong Longitude and Latitude International Trading was selling Counterfeit Products to Internet users through Taobao.com, and on February 24, 2014, Plaintiffs' representatives—after inspecting Hong Kong Longitude and Latitude International Trading's products and verifying that the merchant was selling Counterfeit Products—notified Taobao Marketplace of that fact. Nonetheless, Hong Kong Longitude and Latitude International Trading continued to market Counterfeit Products on Taobao.com. On June 19, 2014, less than four months after Plaintiffs' representatives notified the Taobao Marketplace that Hong Kong Longitude and Latitude International Trading's online storefront was offering Counterfeit

Products, Hong Kong Longitude and Latitude International Trading sold a counterfeit "Gucci" bag to Plaintiffs' investigator through Taobao.com for shipment to New York. The Counterfeit Product was shipped to a customer in New York and received on or about July 1, 2014. *See* Holmes Decl. ¶ 39; *id.*, Ex. 18. The bag, depicted below, bears Gucci's federally registered trademark repeating "GG" design (U.S. Reg. No. 4,229,081), and is offered for sale by Hong Kong Longitude and Latitude International Trading for 1255 RMB, which is approximately $202. On or about June 17, 2014, Plaintiffs' representatives inspected products received from Hong Kong Longitude and Latitude International Trading and verified that the merchant is selling counterfeit bags bearing the Gucci Marks.



64. Further, Defendant Coco Fashion Style was selling Counterfeit Products to Internet users through Taobao.com. On April 25, 2014, Plaintiffs' representatives—after inspecting Coco Fashion Style's products and verifying that the merchant was selling Counterfeit Products— notified the Taobao Marketplace that Coco Fashion Style was offering counterfeit Bottega Veneta bags and wallets to Internet users through Taobao.com. Nevertheless, Coco Fashion Style continued to market Counterfeit Products on Taobao.com. On June 19, 2014, less than two months after Plaintiffs' representatives notified Taobao Marketplace that Coco Fashion Style's online storefront was offering Counterfeit Products, Coco Fashion Style sold a

counterfeit Bottega Veneta wallet to Plaintiffs' investigator through Taobao.com for shipment to New York. The counterfeit wallet, depicted below, bears Bottega Veneta's federally registered trademark intrecciato design (U.S. Reg. No. 4,527,371), and is offered for sale by Coco Fashion Style for 258 RMB, which is approximately $42. Plaintiffs' representatives inspected products received from Coco Fashion Style and verified that the merchant is selling counterfeit bags and wallets bearing the Bottega Veneta Marks, including Bottega Veneta's registered trademark name.



65.     Shown below is an image of an authentic Balenciaga "Pads Riding Sandal," which retails for $605. The product displayed below bears Balenciaga's federally registered trademark BALENCIAGA name (U.S. Reg. No. 1,018,311).



66.     In comparison, set forth below is an image of a Counterfeit Product offered for sale to the public through Taobao.com by Defendant Ladylidy Shop. The price of the shoes, 320 RMB, is approximately $52. Although it is obvious that Ladylidy Shop is selling wholesale

quantities of Counterfeit Products from its electronic store, the Counterfeit Product mimics the design of the authentic Balenciaga sandal shown above and bears an exact copy of Balenciaga's federally registered trademark name. The Counterfeit Product is intended to confuse both the ultimate retail consumer and persons observing the ultimate consumer into believing that it is a genuine Balenciaga product.



67.     Upon inspecting Ladylidy Shop's electronic storefront and the fact that the merchant sells "Balenciaga" shoes for approximately $52 per pair, Plaintiffs' representatives verified that this merchant is selling Counterfeit Products on Taobao.com. And upon inspecting the product shown above, Plaintiffs' representatives verified that the shoes are, indeed, counterfeit. On May 31, 2014, Ladylidy Shop sold counterfeit "Balenciaga" shoes to Plaintiffs' investigator through Taobao.com for shipment to New York. *See* Holmes Decl. ¶ 31; *id.*, Ex. 10.

68.     Plaintiffs did not authorize the Merchant Defendants to manufacture, import, export, distribute, advertise, sell, or offer to sell Plaintiffs' Products and did not have the opportunity to control their quality and nature. Plaintiffs did not approve the Counterfeit Products for sale and/or distribution. Plaintiffs did not authorize the Merchant Defendants to make the Counterfeit Products or to offer them for sale to any customers.

*Merchant Defendants Selling Counterfeit Products Through AliExpress.com*

69.     Defendant Xiaohui Jin's Store ("Xiaohui Jin") admittedly offers Counterfeit

Products for sale through AliExpress.com. Xiaohui Jin advertises its counterfeit "Gucci"

products as "as good as the original ones, but not as dear as original ones in your country." Set

forth below is an image of a counterfeit Gucci bag offered for sale to the public through

AliExpress.com by Xiaohui Jin, which bears Gucci's federally registered trademark GUCCI

name and repeating "GG" design (U.S. Reg. Nos. 876,292; 4,229,081).



70.     Xiaohui Jin's electronic storefront also offers Counterfeit Products advertised as

Bottega Veneta, as shown below, through AliExpress.com.



71.   Moreover, Xiaohui Jin's electronic storefront web page includes language below

the Counterfeit Products indicating the products are "replicas":

> these item are not so good. Instead, they are as good as the original ones, but not as dear as original ones in your
> country.
> if you want to tell the difference between Authentic and OEM form Hong Kong, a magnifying glass is necessary.
> To be brief, our items have high quality and low price but the highest cost performance! You can buy this kind of special
> offer from us at a low price due to China as World Manufactory and have power debase price but keep high quality. We
> have a department store in Nanjing road in Shanghai and another store in EBay. Although we come to aliexpress not
> very long time, you will remember the Xiaohui Jin at first deal with us. We offer big discount to wholesaler! We delete the
> item close out isochronous, so every item display you can see is in stock. You can see it, you can buy it and you can get
> it. So even we are not online, you can buy it now. When you see your items, you must like it. If our store has not what
> you want, you can leave a message at any item below. We will stock the item you have asked before as soon as
> possible.

72.   Upon inspecting Xiaohui Jin's electronic storefront, its unauthorized use of

Plaintiffs' Marks, and its language admitting that the goods it offers for sale through

AliExpress.com are not authentic, Plaintiffs' representatives verified that Xiaohui Jin's electronic

storefront is selling Counterfeit Products.

73.   Shown below is an image of an authentic YSL T-shirt, which retails for $295.

The product displayed below bears YSL's federally registered trademark YSL name and logo

(U.S. Reg. Nos. 1,712,999; 1,711,127).



74.    In comparison, set forth below is an image of a Counterfeit Product offered for

sale to the public through AliExpress.com by Defendant Fashion Zone Ltd. ("Fashion Zone").

The price of the T-shirt is $14.99 per piece. Although it is apparent that Fashion Zone is selling

Counterfeit Products from its electronic store, the Counterfeit Product mimics the logo and

design of the authentic YSL T-shirt shown above and bears an exact copy of YSL's federally

registered trademark name. The Counterfeit Product is intended to confuse both the ultimate

retail consumer and persons observing the ultimate consumer into believing that it is a genuine

YSL product.



75.    Upon inspecting Fashion Zone's electronic storefront and the fact that the

merchant sells mass quantities of a $295 T-Shirt for $14.99, Plaintiffs' representatives verified

that this merchant is selling Counterfeit Products on AliExpress.com.

76.     The Counterfeit Product above was purchased from the Defendants by Plaintiffs' investigator on June 1, 2014, for shipment to New York, and was received on or about June 23, 2014. *See* Holmes Decl. ¶ 45; *id.*, Ex. 21.

77.     Plaintiffs' representatives inspected the T-Shirt sold by Fashion Zone and verified that it is counterfeit.

78.     Further, shown below is an image of an authentic Gucci "Original GG Canvas Diaper Bag Tote," which retails for $795. The product displayed below bears Gucci's federally registered trademark GUCCI name, repeating "GG" design, and green-red-green stripe (U.S. Reg. Nos. 878,292; 4,229,081; 1,122,780).



79.     In comparison, set forth below is an image of a Counterfeit Product offered for sale to the public through AliExpress.com by Defendant Star Factory. The price of the handbag is $9.90. Although it is apparent that Star Factory is selling Counterfeit Products from its electronic store, the Counterfeit Product mimics the design of the handles and ornamentation of the authentic Gucci handbag shown above and bears an exact copy of Gucci's federally registered trademark name, repeating "GG" design, and green-red-green stripe. The Counterfeit Product is intended to confuse both the ultimate retail consumer and persons observing the ultimate consumer into believing that it is a genuine Gucci product.



80.     Upon inspecting Star Factory's electronic storefront and the fact that the merchant offered a $795 handbag for $9.90, Plaintiffs' representatives verified that this merchant is selling Counterfeit Products on AliExpress.com.

81.     The Counterfeit Product above was purchased from the Defendants by Plaintiffs' investigator on June 1, 2014. *See* Holmes Decl. ¶ 44; *id.*, Ex. 20. The Counterfeit Product was shipped to a customer in the United States and received on or about June 12, 2014. *See* Holmes Decl. ¶ 44; *id.*, Ex. 20.

82.     Plaintiffs' representatives inspected the above item sold by Star Factory and have confirmed that the bag is counterfeit.

83.     Plaintiffs did not authorize the Merchant Defendants to manufacture, import, export, distribute, advertise, sell, or offer to sell Plaintiffs' Products and did not have the opportunity to control their quality and nature. Plaintiffs did not approve the Counterfeit Products for sale and/or distribution. Plaintiffs did not authorize the Merchant Defendants to make the Counterfeit Products or to offer them for sale to any customers.

84.     Although these Merchant Defendants selling goods through Alibaba.com, Taobao.com, and AliExpress.com are obviously selling Counterfeit Products, and they have gone to great lengths to ensure that the Counterfeit Products will mimic the visual cues of authentic Gucci, Balenciaga, Bottega Veneta, and YSL Products, the Merchant Defendants' Counterfeit

Products do not adhere to the quality of authentic Plaintiffs' Products. As described above, the Merchant Defendants use lower quality materials, as well as inferior hardware, and the Counterfeit Products do not contain authorized tags or certificates of authenticity from Plaintiffs.

85. The Merchant Defendants' use of Plaintiffs Marks on their Counterfeit Products and their imitation designs are particularly dangerous to Plaintiffs because the Merchant Defendants offer their Counterfeit Products for sale through websites on the Internet, as do Plaintiffs and some authorized sellers of Plaintiffs' Products. The global sale of counterfeit goods is one of the greatest threats to Plaintiffs' businesses because of the damage that counterfeit products cause to the reputations and goodwill that Plaintiffs have spent years developing. As a result, Plaintiffs devote significant resources to fighting the sale of counterfeit goods. For example, Plaintiff Gucci seizes tens of thousands of items of counterfeit products such as those sold by the Merchant Defendants every year. Gucci also shuts down hundreds of infringing websites each year.

86. Although it is obvious that the Merchant Defendants are selling Counterfeit Products from their electronic stores, the Counterfeit Products mimic the design of Plaintiffs' Products and bear exact copies of Plaintiffs' Marks. The Merchant Defendants' Counterfeit Products are intended to confuse both the ultimate retail consumer and persons observing the ultimate consumer into believing that they are genuine Plaintiffs' Products.

**THE IRREPARABLE INJURY**

87. The Merchant Defendants' actions are particularly harmful to Plaintiffs' goodwill and reputation because the Merchant Defendants' advertising of their Counterfeit Products misleads some consumers into believing that they are actually purchasing authentic versions of Plaintiffs' Products. In addition, many of the Merchant Defendants are selling mass quantities of

wholesale Counterfeit Products—or the materials used to manufacture such goods—intended to confuse and deceive the ultimate retail consumers into believing they are purchasing authentic Gucci, Bottega Veneta, and YSL Products when they are actually receiving materially inferior, unauthorized products bearing counterfeit versions of Plaintiffs' Marks. All of the Merchant Defendants use Plaintiffs' federally registered trademarks in their online product listings when, in fact, the Merchant Defendants are selling unauthorized Counterfeit Products. The result of the Merchant Defendants' manufacturing, advertisement, distribution, and sale of Counterfeit Products—whether to other merchants knowingly seeking to profit from selling the goods to unsuspecting consumers, genuinely confused consumers, or consumers seeking a cheap "knockoff"—will be to deceive and mislead consumers into believing that the Merchant Defendants' Counterfeit Products are authorized or sponsored by Plaintiffs and to dilute Plaintiffs' brands.

88. The Merchant Defendants' activities are causing immediate and irreparable harm to Plaintiffs in many ways. In the first instance, an unknowable number of consumers will visit Alibaba.com, AliExpress.com, and/or Taobao.com, and possibly purchase the Merchant Defendants' Counterfeit Products because of the Merchant Defendants' use of Plaintiffs' Marks. There is no way to determine precisely how many of these consumers may have otherwise visited authorized sellers of Plaintiffs' Products and made purchases of authentic products were it not for the Merchant Defendants' unauthorized use of the Plaintiffs' Marks to misdirect consumers. Under either scenario, the Merchant Defendants' activities may have resulted in lost sales and market share to Plaintiffs.

89. Worse, an incalculable number of consumers will become confused into believing that there is some connection between Plaintiffs, on the one hand, and the Merchant Defendants

or their Counterfeit Products, on the other hand, particularly consumers who see the inferior Counterfeit Products post-sale. As a result of the Merchant Defendants' deception, these consumers may develop a lower opinion of Plaintiffs' Products. Consumers who are exposed to the Merchant Defendants' Counterfeit Products may be less likely to buy Plaintiffs' Products in the future when they see the poor quality of the Merchant Defendants' Counterfeit Products or otherwise become disappointed by the way that the Merchant Defendants conduct business outside the authorization or influence of Plaintiffs. Moreover, the presence of unlicensed imitation Counterfeit Products in the marketplace harms the image and cachet of authentic Gucci, Balenciaga, Bottega Veneta, and YSL Products. As a result, the Merchant Defendants' activities are causing irreparable injury to the reputation and goodwill of Plaintiffs' valuable brands.

90.    Plaintiffs have commenced numerous actions against foreign merchants of Counterfeit Products. Typically, Plaintiffs recover very little, if any, of the damages to which they are entitled under the Lanham Act. This is because the defendants in these actions often maintain their assets in overseas, off-shore accounts through shell corporations, making it difficult to recover against the judgments Plaintiffs have lawfully obtained. The funds of these defendants are often transmitted through several different countries before reaching their ultimate destination, making these funds even more difficult to recover.

91.    An asset freeze significantly increases the amount of funds that Plaintiffs may ultimately recover from counterfeiters against whom Plaintiffs obtain a judgment. For example, in the action *Gucci America, Inc. et al. v. Myreplicahandbag.com, et al.*, No. 07 Civ. 2438, in which Judge Koeltl entered a preliminary injunction freezing defendants' assets, Gucci recovered nearly $200,000 from the counterfeiters' accounts. This amount far exceeds Gucci's recovery in

actions where an asset freeze was not put in place to preserve the defendants' assets for an equitable accounting or award pending resolution of the action.

92.     The Merchant Defendants should be immediately enjoined from selling fraudulent Gucci, Balenciaga, Bottega Veneta, and YSL Products and have no equitable interest in continuing this damaging and illegal activity.

93.     There are no known counterclaims in this action.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in New York,

New York, June 30, 2014.

_____
Laurent Claquin